TEXAS & NEW ORLEANS RAILWAY COMPANY v. MARY ANN STEWART.

Decided November 14, 1902.

Railway Company—Collision—Brakeman—Assumed Risk—Contributory Negligence.

Where a freight train had broken in two, and a brakeman, charged with the duty of keeping a watch on the train, went back to the rear of the front portion and from there signaled the engineer to back and continued to so signal until a moment before the collision, when he gave the signal to stop, too late to avoid the collision which resulted in his death, he assumed the risk or was guilty of contributory negligence such as would bar a recovery, although no flagman had been sent back, as required by the rules.

Error from the District Court of Harris County. Tried below before Hon. Wm. H. Wilson.

*Baker, Botts, Baker & Lovett* and *A. L. Jackson,* for plaintiff in error.

*James A. Breeding,* for defendant in error.

GILL, ASSOCIATE JUSTICE.—This was a suit by Mary Ann Stewart, as plaintiff, against the Texas & New Orleans Railroad Company, as defendant, to recover damages for the death of her son, William Stewart, which she alleged was caused by the negligence of the defendant. A trial by jury resulted in a verdict and judgment for plaintiff, from which defendant prosecutes this writ of error.

The facts out of which the action grew appear without material dispute, and are briefly stated as follows:

On the night of October 21, 1899, William Stewart, who was the son of plaintiff, was in the employ of defendant as brakeman, and as such was engaged as head brakeman on a freight train of defendant running between China and Sour Lake, two stations on defendant's road. There was a train running in the same direction just ahead of the train on which William Stewart was engaged, but it had passed Sour Lake in the direction of Houston at the time of the accident. The train in question was in charge of an engineer, Fred Keeler; B. F. Williams, the fireman; deceased Stewart, the head brakeman; T. J. Smith, the rear brakeman; and C. R. Paynter, the conductor. The accident was caused by the parting of the freight train and the collision of the parts thereafter. The proper position of the head brakeman was on top of the cars nearest the engine, from which position he could best discover any accident to the train and prevent disastrous consequences, though custom permitted him to ride in the cab of the engine, from which position he could also keep an effective lookout.

The rear brakeman's proper place was in or on the caboose, in some position from whence he could see signals from the engine or front brakeman and otherwise watch the train. The conductor's position was

in the caboose and it was his duty also to take and give signals, but as he had other duties which at times engaged his attention inside the caboose, the duty of lookout from that end of the train was primarily imposed on the rear brakeman.

The company by its rules (which were placed in the hands of all trainmen and with the provisions of which they were all expected to familiarize themselves) had minutely prescribed the duties of each member of the train crew in case of the parting of the train while in motion, and a strict compliance with these rules would in almost every case protect both the lives of the crew and the property of the company. One of the rules provided that when the engineer discovered or was apprised that his train had parted while in motion he should continue the engine in forward motion and give three long blasts of the whistle, which would be a signal to the portion of the crew on the rear of the train that the train had broken in two. These signals were to be repeated until responded to by those on the rear, and in no event should he back up until the rear portion of the train was stopped. A signal for the benefit of the engineer was also provided when the break was discovered by others than those on the engine, the object of the provisions being to keep the front end of the train out of reach of the rear end until the latter was brought to a standstill. It was the duty of those on the rear part of the train to bring the detached part to a standstill as quickly as possible.

When it was ascertained by the engineer through signals from the rear that his train had parted and that the rear end had been stopped, it was his duty to back the front end of the train at a speed not exceeding four miles an hour, having first sent a signal man a prescribed distance back in the direction of the detached portion of the train. On the night in question the train had left the station at China and the engine had approached within a mile of Sour Lake station when deceased, who was riding in the engine cab, stated to the engineer that he believed the train had broken in two. The engineer immediately slowed the engine and told deceased to drop off and go back and see. This was done, and when he reached the back end of the front portion he went to the last car, which was then attached to the front portion (four cars having remained with the engine), went round the end of the car as if to inspect the drawhead, then came out, gave a stop signal, mounted to the top of the car, and signaled the engineer to back up. This the engineer did at a speed of six or eight miles an hour, the signals from deceased to back up being continually repeated. In a little while they came in violent contact with the rear portion of the train, which was approaching at a speed of twenty-five or thirty miles an hour. Several cars were demolished and deceased received injuries from which he died within a few hours. A moment before the collision the engineer received a violent stop signal from deceased and immediately applied his air brakes, but this was done too late to avert the accident.

The caboose had side lights on it showing green in front and red be-

hind, designed as "markers" for the engineer and front brakeman so that if the train parted at night it could be readily discovered. The conductor and rear brakeman testified that these were burning on the occasion in question and the engineer and fireman swear they were seen a moment after the accident, but swear also they did not see them either when they discovered the break in the train or at any time between then and the accident. The track was straight and these lights could be seen for more than a mile. The conductor and rear brakeman testified they did not discover the break until the moment of the accident, though they noticed a rocking motion of the train and supposed the engineer had shut off steam in order to enter Sour Lake with the train under full control. They did nothing to stop the rear portion of the train and gave no signals. The track was straight. The night was dark but clear, and the conditions were favorable to the seeing of signals.

Upon this state of facts the plaintiff predicated a right to recover upon three grounds:

First. Negligent failure to furnish and provide sufficient and safe machinery and appliances to be employed in the operation of the train, and from carelessness and negligence of the vice-principals and other servants, including the conductor and rear brakeman, to perform their reasonable duty for the safety of deceased. Second. In failing to give deceased any warning of the approach of the rear portion of the train. Third. That the engineer was negligent in failing to keep the front portion of the train in motion until the rear portion had been stopped and in failing to give three long blasts of the whistle and repeat the same until the signal was answered as required by the rules, and in backing up the train too rapidly and not taking other precautions prescribed by the rules.

Defendant answered by general denial and pleas of contributory negligence and assumed risk.

The trial court submitted the case alone upon the alleged negligence of the engineer in putting the engine in backward motion before learning that the rear portion had been stopped and in failing to give and continue to give the whistle signals prescribed by the rules. As defenses he submitted the issues of contributory negligence and assumed risk.

The assignments of error in their various forms present but the one question,—the sufficiency of the evidence to support recovery. The jury might well have held the engineer to have been negligent, for the rear lights were burning, and according to his own statement of the surrounding circumstances could have been seen by him at a great distance had he made the proper effort to see them. The only theory under the evidence which might excuse him was that there was a provision in one of the rules to the effect that the precautions usually imposed on him might be omitted when the rear portion of the train stopped and was in plain open view. It is possible in this case that having sent the front brakeman back and receiving a back up signal from him he rested on

the assumption that deceased had discovered the rear portion standing in plain view and therefore took no further precautions. The rear brakeman might be held negligent, because had he been keeping the needful lookout he would have discovered the break at once and stopped the rear portion of the train.

The conductor may have been equally culpable under the facts, for though he might under some circumstances have acted on the assumption that the rear brakeman was doing his duty, the facts in this case tend to show that he was aware the brakeman was not on watch. Their apparent mutual fault is accentuated by the fact that they knew they were approaching a station and had to meet a train there, and the rules of the company as well as common care required that under such conditions every member of the crew should be on the alert and at his post of duty. But irrespective of the conduct of the other members of the crew, it appears to us too plain for controversy that deceased of all others was most to blame.

He knew the rules formulated by the company for the safety of the train. His position was on top of the cars near the engine where he could get a better view than any other of the entire length of the train. If it was permissible for him to ride in the engine cab (and we hold that it was), he was still in a better position than either the engineer or the fireman to keep an effective lookout to the rear. The fireman in the nature of things was engaged much of his time in keeping up his fire. The engineer was burdened with the primary duty to look out ahead, both for the safety of the train and of those who might be upon the track, while upon deceased was imposed the one duty to watch the train, and his attention was not distracted or divided by any other. He in fact first discovered the breaking of the train, and called it to the attention of the engineer. The latter slowed the engine and sent the deceased back to make discoveries. The deceased went back where he would be in the best position to see, and from this point of vantage signaled the engineer to stop and back up. He persisted in giving the back up signal almost to the moment of the accident, and appellee ought not to be heard to complain that his signals were obeyed. When he gave the stop and back up signals he must have known one of two things, either that the rear portion had not stopped, or that he was ignorant of its position and condition as to rest or motion. If he knew it had not stopped, he assumed the risk of backing the train. If he had no knowledge upon the subject and could not with certainty ascertain the facts, he equally assumed the risk of inducing the engineer to back the train. The failure of the engineer to give the whistle signals can not change the results in this respect, for deceased knew they were not being sounded. He knew also that no flagman had been sent back, notwithstanding the plain requirement of the rules. Knowing all these things and the apparent danger he was incurring and to which he was subjecting his fellow workmen, it is difficult to account for his conduct. Indeed, to

undertake to account for it as the record stands would be pure speculation.

But appellee undertakes to answer this position and sustain the verdict by resort to a note to one of the rules, the note being as follows: "When necessary to protect the front end of the train, the front brakeman will be subject to orders and instructions of the engineer."

It is contended that deceased was obeying such instructions in acting as he did, and in so doing was under the direct control of a superior. This contention is manifestly unsound. He was told by the engineer to drop off and go back and see. This order he appeared to obey, but the engineer did not tell him to give a stop or back up signal. These signals were in effect an assurance to the engineer that his order had been obeyed; that he had gone back and that he had discovered conditions which rendered it safe to back up; and instead of being misled by the engineer he perhaps misled the engineer.

We think the defense of assumed risk, or else of contributory negligence, was established as a matter of law, and that the trial court should have directed a verdict for defendant.

The facts being undisputed and appearing to have been fully developed upon the trial, the judgment is reversed and judgment is here rendered for appellant.

*Reversed and rendered.*